Argued and submitted August 13, affirmed September 29, 1980

# BRALEY, et ux,
## *Appellants,*
### *v.*
## HESS, et al,
## *Respondents.*

## (No. E78-3052, CA No. 15999)
617 P2d 308

Robert H. Anderson, Roseburg, argued the cause for appellants. With him on the brief were Edward M. Murphy and Anderson, Gegavske & Seitz, Roseburg.

Herb Lombard, Eugene, argued the cause for respondents. With him on the brief were Warren T. DeLaVergne, Drain, and Lombard, Gardner, Honsowetz & Brewer, Eugene.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

WARDEN, J.

## WARDEN, J.

Plaintiffs brought suit to quiet title in a strip of land included within the description of the property contained in their deed. Defendants filed a counterclaim (erroneously labeled "cross-complaint") seeking title to the strip on the basis of adverse possession. The trial court found for defendants and plaintiffs appeal.

First, we note that the issue *is* adverse possession. Plaintiffs contend that the trial court based its decision upon the theory of boundary by acquiescence, which had not been pleaded. The trial court, however, in a memorandum announcing its decision, relies upon cases decided on the basis of the adverse possession doctrine. We are satisfied that the decree was based upon adverse possession.

The land in contention is a narrow strip of timber and brush along the boundary dividing plaintiffs' land to the north and defendants' land to the south. It is 34.25 feet at its widest on the eastern end, extends 887.43 feet to the west, narrowing down to 10.61 feet at its western end. It is separated from plaintiffs' land for much of its length by a post and wire fence.

Plaintiffs took possession of their property in 1967. Their predecessor in interest, Marvin Thompson, acquired the property in 1951 from his father, Elmer Thompson, who purchased it in 1925.

Defendants Lonnie and Kathryn Bunce purchased their property from defendants Hess and Bedortha in 1978. Hess and Bedortha purchased the property in 1977 from Harold Thorp, who remained in possession until September, 1978, in accordance with his sale agreement with Hess and Bedortha. The Bunces immediately followed Thorp in possession of the property. Thorp had purchased the property in 1955.

The land in the area is open range land. In 1925, Elmer Thompson built a post and wire fence around what is now plaintiffs' property to prevent his stock from roaming. The fence along the south of the

1925 enclosure marks the north edge of the disputed strip. In 1957, a creek flooded and the western portion of the fence was buried. That portion of the fence has not been repaired, but in 1957 Thorp asked plaintiffs' predecessor, Marvin Thompson, to help repair it. At that time Marvin informed Thorp that the fence was not the true boundary between the two properties. Thorp disagreed and asserted that his property included all land up to the fence. He stated he would believe that until a survey was done which showed the boundary differently. He would not share the cost for a survey, however, and no survey was done at that time.

The disputed strip had little value for grazing, being mostly small trees, but Thorp had six or eight head of cattle running on his property, including this disputed strip, during most of his term of ownership. Thorp testified that when he lived on the property the trees were too small or knotty to have any value as timber. He cut some timber on the strip when it blew down, as after the 1962 Columbus Day storm, and when branches broke or fell on the fence. He replaced fence posts, cutting new posts from trees on the strip.

Thorp left the property in 1965, although his wife remained until October, 1966. From that time until they returned in 1969, they rented the place to others. For six to eight months of the time the place was vacant. The Thorps visited the property while it was vacant approximately twice a month. One of the tenants grazed cattle during his tenancy. During the tenancy of another, two horses ran with Thorps horse, which had been brought to the property in 1955 and remained on it until September, 1978. Thorp's horse ran on the disputed strip throughout this time. About 1968, during the occupancy by one of the tenants, Thorp and the tenant repaired the fence.

Plaintiffs took possession of their property in 1968. Marvin Thompson told them at the time of purchase that the fence was about 50 feet north of their true property line. Plaintiff Robert Braley testified that Thompson had stacked cedar fence posts on the strip in preparation for erecting a new fence along

the true line. In 1970 or 1971, the Braleys put a gate in the fence so their stock could enter the strip and follow the fence along the south side down to the creek.

■ "To establish ownership of land by adverse possession, it must be shown that the possession was actual, open, notorious, hostile, continuous, and exclusive, under a claim of right or color of title, for a period of ten years." *Grimstad v. Dordan,* 256 Or 135, 139, 471 P2d 778 (1970). One who alleges title by adverse possession carries a heavy burden of establishing by clear and positive proof each element of adverse possession. *Whitley v. Jacobs,* 278 Or 541, 564 P2d 1057 (1977).

■ To prevail, defendants must tack their period of possession to that of their predecessor Thorp, or rely upon the establishment of title by adverse possession at an earlier time by Thorp alone. We find that no adverse possession can be claimed by defendants for the years immediately preceding the filing of suit in December, 1978, and after 1970 or 1971, when plaintiffs put in the gate allowing their animals to travel along the southern side of the fence down to the creek. This use by plaintiffs had an air of possession and ownership about it in conflict with the proposition that defendants had exclusive possession of the strip. Thorp and his successors therefore cannot claim exclusivity of possession during this period of time.

We therefore consider whether adverse possession had been established by defendants' predecessor before 1970.

■ When Thorp moved on his property in 1955, he brought his horse and allowed the horse to roam at will on the disputed property. This is an open indication of belief of ownership and use of land. His 1957 declaration to Marvin Thompson that his property included all land south of the fence is sufficient to fulfill the requirement of hostility. *Norgard v. Busher,* 220 Or 297, 349 P2d 490 (1960). During the years from 1955 through 1969, Thorp did not do much with the land, but there was very little that could be done with it. The uses for which the land in issue is

suitable must be taken into account in assessing the sufficiency of the adverse possession. *Lee v. Hansen,* 282 Or 371, 578 P2d 784 (1978).

█        Throughout a 15-year period Thorp or his tenants cut trees when they were down and maintained the fence, using trees from the strip for posts to replace those that had rotted. Thorp's horse continued to run on the disputed property and, during most of these years, he or a tenant ran cattle on it. He used the land to as great an extent as an average owner of the land would. *See Terry v. Timmons,* 282 Or 363, 578 P2d 405 (1978); *Mattoon v. Clayborn,* 42 Or App 893, 602 P2d 657 (1979). There is no evidence that plaintiff's predecessor, Thompson, used the land at all after 1955. Thorp's declaration of ownership to Marvin Thompson and his maintenance of the fence were open and notorious indications of his intention to claim title to the land. We hold that Thorp, by actual, open, notorious, exclusive, continuous and hostile possession of the disputed strip between 1955 and 1970, acquired title by adverse possession. Defendants, as successors to his interest, also succeed to his title.

Affirmed.